## S08A0445. WHITAKER v. THE STATE.
(661 SE2d 557)

HINES, Justice.

A jury found Julius Whitaker, Jr., guilty of felony murder while in the commission of aggravated assault, aggravated assault with the intent to murder, aggravated assault with a deadly weapon, theft by taking a motor vehicle, and possession of a weapon during the commission of a crime in connection with the fatal stabbing of Larry Copeland. Whitaker appeals his convictions, challenging the denial of his motion in limine, the allowance of certain testimony at trial, and portions of the charge to the jury. Finding the challenges to be without merit, we affirm.[1]

The evidence construed in favor of the verdicts showed that around noon on February 10, 2006, Copeland's neighbor, Cumley, telephoned him to confirm her earlier request to get a ride to a store that day. Copeland sounded "very agitated," and although he frequently gave Cumley rides for payment, he declined to do so. Shortly before 1:00 p.m., Cumley noticed that Copeland's 1996 Chevrolet Caprice was missing from his driveway. Over the next few hours, Cumley made several failed attempts to reach Copeland on the telephone.

Around 10:00 p.m. that night, the Forest Park Police Department received a "person-down" call and information that there was a "very erratic person" on the telephone with the 911 operator. When

---

[1] The crimes occurred on February 10, 2006. On December 21, 2006, a Clayton County grand jury indicted Whitaker for Count 1 – aggravated assault with the intent to murder; Count 2 – aggravated assault with a deadly weapon; Count 3 – malice murder; Count 4 – felony murder while in the commission of aggravated assault; Count 5 – possession of a weapon during the commission of a crime; and Count 6 – theft by taking a motor vehicle. Whitaker was tried before a jury May 14-16, 2007; he was found not guilty of Count 3 – malice murder, but was found guilty of the remaining charges. On May 18, 2007, Whitaker was sentenced as a recidivist to life in prison on Count 4, a consecutive five years in prison on Count 5, and ten years in prison on Count 6, to be served consecutively with the sentence on Count 4 but concurrently with the sentence on Count 5; the trial court found that Counts 1 and 2 merged with Count 4 for the purpose of sentencing. Whitaker filed an untimely notice of appeal on June 20, 2007, the case was docketed in this Court on October 1, 2007 (Case No. S08A0169), and the appeal was dismissed as untimely on October 29, 2007. Whitaker was granted an out-of-time appeal on November 6, 2007, the notice of appeal was filed on November 12, 2007, and the case was re-docketed in this Court on November 16, 2007. The appeal was submitted for decision on January 7, 2008.

police arrived at the scene, they encountered Copeland's roommate, who was "screaming" and "yelling" that Copeland was "bleeding all over the place" and that he was dead. An officer entered the home and found Copeland's body surrounded by blood; it was obvious to the officer that Copeland had been dead "for a while." The condition of the body along with the timing of Copeland's telephone conversation were consistent with noon as the time of death.

Copeland died from a massive hemorrhage caused by a stab wound that punctured his aorta and caused over a quart of blood to fill his chest cavity. Copeland also had slash wounds across his throat. The wounds were caused by a single-edged knife which could have measured as much as five inches in length.

Copeland's home showed signs of a struggle. In Copeland's bedroom, police found a scrap of paper bearing a telephone number that they traced to the home of Whitaker's father, where Whitaker sometimes stayed.

Following the issuance of a bulletin for Copeland's missing car, the next morning it was spotted in Cartersville by police. When the police car's flashing lights were turned on, the Caprice took off. Due to traffic conditions, the deputy was forced to end the chase. A short time after, however, the deputy learned that the car had been abandoned after it ran into an embankment, and a "large" African-American man was spotted fleeing from the vehicle. Authorities recovered a soda can from the vehicle containing Whitaker's DNA and fingerprint. Whitaker's then girlfriend lived in Cartersville. Whitaker turned himself in to authorities the Monday following the murder, and admitted to having Copeland's car in Cartersville, although he told varying stories about the length of time he had the vehicle.

While in jail, Whitaker told an inmate that he beat Copeland after becoming angry that Copeland reneged on his promise to allow Whitaker to borrow his car in exchange for oral sex. Whitaker admitted to killing "the gay guy," as he referred to Copeland, but claimed that he had not meant to do so. Whitaker asked the inmate to assist in court with Whitaker's "alibi" by testifying that Copeland continually harassed him about having sex.

1. The evidence was sufficient to enable a rational trier of fact to find Whitaker guilty beyond a reasonable doubt of the crimes for which he was convicted. *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979).

2. Whitaker contends that the trial court erred in denying his motion in limine which sought to prevent the State, for the purpose

of impeachment, from questioning him, if he testified at trial,[2] regarding his prior convictions for burglary, statutory rape, and failure to register as a sex offender. He argues that *Adams v. State*, 284 Ga. App. 534 (644 SE2d 426) (2007), is controlling, and would have prevented the State from using his prior convictions, even though felonies, unless they were crimes involving dishonesty. But, the argument is unavailing.

As stated in *Adams*, "OCGA § 24-9-84.1 was enacted in 2005 to establish guidelines for the use of criminal convictions to impeach witnesses or defendants who testify." However, at issue in *Adams* was whether the trial court correctly allowed the State to attempt to impeach Adams's credibility with a misdemeanor conviction for theft by receiving stolen property. Accordingly, the portion of OCGA § 24-9-84.1 applicable in that case was paragraph (a) (3), which provides that

> [e]vidence that any witness or the defendant has been convicted of a crime shall be admitted if it involved dishonesty or making a false statement, regardless of the punishment that could be imposed for such offense.

However, in this case, unlike *Adams*, the issue is impeachment with prior felonies, and thus, the matter is subject to the provisions of paragraph (a) (2), which states:

> Evidence that the defendant has been convicted of a crime shall be admitted if the crime was punishable by death or imprisonment of one year or more under the law under which the defendant was convicted if the court determines that the probative value of admitting the evidence substantially outweighs its prejudicial effect to the defendant; . . .

The State expressly sought to impeach Whitaker under OCGA § 24-9-84.1 (a) (2), and the trial court correctly recognized its applicability to Whitaker's situation. It was not error to deny Whitaker's motion in limine on the basis urged.

3. Whitaker contends that the trial court erred when it allowed the State to introduce testimony that Whitaker invoked his right to remain silent during police questioning, and when it denied Whitaker's motion for mistrial based upon such testimony.

---

[2] Whitaker did not testify at trial.

The detective testified that Whitaker was read his *Miranda*[3] rights, signed a waiver of those rights, and that he answered questions about his connection to Copeland's car; however, when he was further questioned about his relationship with Copeland and what had transpired, Whitaker invoked his *Miranda* rights.[4] Whitaker's trial counsel moved for a mistrial which was denied; the trial court concluded that under these circumstances in which the defendant had started giving a statement and then just stopped, the officer could explain why the interview with Whitaker was terminated. The trial court then gave a curative instruction to the jury, as requested by Whitaker.[5] The motion for mistrial was renewed, but not granted.

Certainly, the fact that a defendant has exercised the right to remain silent is not to be used against the defendant at trial. *Taylor v. State*, 272 Ga. 559, 561 (2) (d) (532 SE2d 395) (2000). However,

> [a]n improper comment on the defendant's silence does not necessarily require a reversal. The grant or denial of a mistrial is within the trial court's sound discretion, and [the appellate court] will not interfere with the trial court's exercise of that discretion unless it is clear that a mistrial was essential to preserve the right to a fair trial.

*Parks v. State*, 281 Ga. App. 679, 681 (2) (637 SE2d 46) (2006). Furthermore, testimony about the defendant remaining silent is not deemed to be prejudicial if it is made "during a narrative on the part of the authorities of a course of events" and "apparently was not intended to, nor did it have the effect of, being probative on the guilt or innocence of the defendant." *Taylor v. State*, supra at 561 (2) (d). Indeed, to warrant a reversal of a defendant's conviction, the evidence of the election to remain silent must "point directly at the substance of the defendant's defense or otherwise substantially prejudice the defendant in the eyes of the jury." Id.

Here, the detective's comment was not directed to any particular statement or defense offered by Whitaker, and the comment on his

---

[3] *Miranda v. Arizona*, 384 U. S. 436 (86 SC 1602, 16 LE2d 694) (1966).

[4] The detective testified:
And then, we got to the point about, did he know Larry Copeland, did he know what had happened there. And, at that point of the interview, he invoked his Miranda rights and said he did not want to speak to us without his attorney. I said, that's perfectly fine and the interview was concluded at that time.

[5] The trial court instructed the jury:
The defendant, in any case, is not required to answer questions by police officers while in custody. And, if you find from the evidence that the defendant, either refused to give a statement or started to give a statement and then terminated his statement, that he is completely within his rights to terminate any statement, at any time, or to refuse to give a statement.

invoking *Miranda* was made during the detective's explanation of the course of events. Nor is there any indication that the comment was intended to, or did, have the effect of being probative on the issue of guilt or innocence. Moreover, the trial court promptly gave a curative instruction to the jury. Under these circumstances, it was not an abuse of the trial court's discretion to refuse to grant a mistrial. *Parks v. State*, supra at 681 (2).

4. Whitaker next contends that the trial court erred in its charge to the jury on both counts of aggravated assault. He concedes that the instructions given were "correct statements of the law pertaining to [a]ggravated [a]ssault"; however, he maintains that the trial court failed to instruct "on all of the essential elements." But, the contention is without merit.

As to aggravated assault with intent to murder, he complains that the trial court failed to instruct the jury about the "[i]ntent to take life." However, that is far from the case. In determining whether there is error, jury instructions must be read and considered as a whole. *White v. State*, 281 Ga. 276, 280 (4) (637 SE2d 645) (2006). The trial court instructed the jury about the charge as alleged in Count 1 of the indictment, and that it would be committed when the "person assaults another person with the intent to murder." The trial court gave further instruction about the definition of murder in the context of malice murder, in that the person unlawfully and with malice "causes the death of another human being." The trial court also instructed the jury about the indicted felony murder while in the commission of aggravated assault, and that "a person also commits a crime of murder when, in the commission of a felony, that person causes the death of another human being." Thus, the trial court's instruction as a whole made plain that the commission of aggravated assault with the intent to murder necessitated the intent to take the life of a human being.

As to aggravated assault with a deadly weapon as alleged in Count 2, Whitaker asserts that the trial court's charge was incomplete in that it did not use certain language to instruct the jury on what constituted a deadly weapon.[6] However, Whitaker did not file a

---

[6] Whitaker asserts that the trial court should have charged:
A certain cutting instrument, if and when used in making an assault upon another person, is not a deadly weapon per se, but may or may not be a deadly weapon depending upon the manner in which it is used and the circumstance of the case. You may or may not infer the lethal character of the instrument in question from the nature and extent of the injury, if any, inflicted upon the person allegedly attacked. Whether or not, under all the facts and circumstances of this case, the certain cutting instrument, alleged in this Bill of Indictment to have been used in making an assault upon the alleged victim did, in fact, constitute a deadly weapon, is a matter to be decided by the Jury from the evidence in this case.

written request to charge any definition of "deadly weapon," much less a request to charge the language now urged. Generally, the failure to request the subject charge in writing precludes further complaint. *Johnson v. State*, 245 Ga. App. 761, 762 (2) (538 SE2d 850) (2000); *Price v. State*, 237 Ga. App. 54, 56 (3) (513 SE2d 40) (1999). Moreover, the failure to give an unrequested charge constitutes reversible error only when the omission is clearly harmful and erroneous as a matter of law in that the charge that was given fails to provide the jury with the proper guidelines for determining guilt or innocence. *Kennedy v. State*, 277 Ga. 588, 591 (3) (592 SE2d 830) (2004). That is not the case here. The trial court instructed the jury regarding the State's burden of proof, and specifically, that the State had to prove that the aggravated assault was made with a deadly weapon as alleged in the case. What is more, the trial court further informed the jury about the deadly weapon at issue in its instruction regarding the charged offense of possession of a weapon during the commission of a crime.

5. There is likewise no merit to Whitaker's contention that the trial court's jury charge on felony murder was confusing in that it required the jury to find that he committed a "homicide," but did not define what a "homicide" is, and that it contradicted the charge on aggravated assault with the intent to murder because of the use of the term "homicide."

Contrary to Whitaker's assertion, there is no requirement to define the word "homicide" in instructing the jury.

> The word is not technical or [a] word of art, the meaning of which would not be understood by people of ordinary experience and understanding. On the contrary, the term[ ] used [is an] ordinary term[ ] found in common usage and understood by people of common and ordinary experience.

(Citation and punctuation omitted.) *Mitchell v. State*, 283 Ga. 341, 344 (659 SE2d 356) (2008). Furthermore, there is no conflict between the use of the word "homicide" in the instruction on felony murder and the charge on aggravated assault with the intent to murder. It is true that not every homicide is a criminal event. *Smith v. State*, 282 Ga. 388, 390 (3) (651 SE2d 28) (2007). However, the trial court's instruction on felony murder made plain that a finding of guilt for that offense had to be based upon a finding of guilt of aggravated assault, and in the context of aggravated assault with intent to murder, the finding of, inter alia, an unlawful killing.

6. Finally, Whitaker contends that the trial court committed reversible error in its instruction to the jury regarding the offense of possession of a weapon during the commission of a crime because, in

contrast to the language of the indictment, the court charged the jury that such crime was committed if a person has "on or within arms reach of his person a knife, having a blade of three or more inches in length," during the commission of "any crime against or involving the person of another."

The court's instruction tracks the language of OCGA § 16-11-106 (b).[7] However, the indictment accused Whitaker of possessing a cutting instrument having a blade "longer than three inches," not a blade of "three or more inches in length" and during the commission of "the crime of murder," rather than "any crime against or involving the person of another." The argument is that such deviation authorized the jury to find that Whitaker violated OCGA § 16-11-106 in a manner other than that which was alleged in the indictment; that is, the jury could have found him guilty of the offense if it found that the knife was exactly three inches in length, or that Whitaker committed any crime, including a misdemeanor.

However, the jury received the indictment, and the trial court instructed the jury that the "indictment and plea form the issue that [it was] to decide," and that the State had to "prove every material allegation of the indictment and every essential element of the crimes charged, beyond a reasonable doubt." Thus, there is no reasonable probability that the jury could have convicted Whitaker of the offense based upon the trial court's instructional deviation from the language of the indictment. *Mitchell v. State*, supra.

*Judgments affirmed. All the Justices concur.*

DECIDED MAY 19, 2008.

*Hecht, Mack & Harris, Robert L. Mack, Jr.*, for appellant.
*Jewel C. Scott, District Attorney, Thurbert E. Baker, Attorney General, Christopher R. Johnson, Assistant Attorney General*, for appellee.

---

[7] OCGA § 16-11-106 provides in pertinent part:
. . .
(b) Any person who shall have on or within arm's reach of his or her person a firearm or a knife having a blade of three or more inches in length during the commission of, or the attempt to commit:
(1) Any crime against or involving the person of another; . . .