**FIRST DIVISION**
**PHIPPS, C. J.,**
**ELLINGTON, P. J., and BRANCH, J.**

NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
http://www.gaappeals.us/rules/

**July 2, 2013**

# In the Court of Appeals of Georgia

A13A0128. LENOIR v. THE STATE.

PHIPPS, Chief Judge.

In connection with an attack upon his then-fiancé D. W. in the presence of her young son, Emmett Lenoir was convicted of aggravated battery, sexual battery, false imprisonment, criminal damage to property in the second degree, cruelty to children in the second degree, and interference with a 911 call. In this appeal, Lenoir challenges the sufficiency of the evidence underlying the property damage conviction. He also argues that the trial court erred in instructing the jury during the final charge and in rejecting his claim of ineffective assistance of counsel. Lenoir has shown merit in only the sufficiency challenge; accordingly, we reverse his property damage conviction and affirm his other convictions.

At trial, the state showed the following. During the time in question, Lenoir was living with D. W. and her son, who was about seven years old.

D. W. testified about the attack that gave rise to this case. During the pre-dawn hours of June 21, 2003, D. W. rebuffed Lenoir's sexual advances. Lenoir, who had been drinking gin that night, accused D. W. of having an affair, pushed her out of the bed, and ordered her to sleep in her son's room. D. W. went to the bedroom where her son was sleeping, but Lenoir told her to come back to their bedroom. She returned and got back into the bed. As he sat in bed drinking gin, she fell asleep.

She was soon awakened, however, when Lenoir punched her in the mouth, causing it to bleed. She sat up. He demanded to know where she had spent her day; as she was providing him an account, he hit her in the head with the gin bottle, causing the bottle to break and the side of her head to bleed. Lenoir went to the kitchen, brought back a bottle of bleach, handed it to her, and ordered her to drink it. She poured the bleach onto the floor, and he punched her in the face.

D. W. headed to the living room for the only telephone in the house, but Lenoir pushed her, punched her in the mouth again, then dragged her by the hair back into the bedroom, where he threw her against the wall and, as D. W. testified, "just started

2

beating me constantly." By this time, her son had awakened and entered the bedroom; he was screaming for Lenoir to stop beating his mother.

Lenoir did not stop. He threw a space heater at D. W., striking the side of her face and head. He pulled down a picture overhanging the bed and broke it into pieces atop D. W.'s head. Then, he used a piece of the broken wooden frame to beat her about the head. Her son remained in the room – watching, crying, and screaming.

D. W. fled into the kitchen to retrieve a knife, but Lenoir was able to reach a steak knife first. When Lenoir tried to stab D. W., she grabbed the blade with her hand, and the blade broke from its handle. Lenoir grabbed another steak knife; D. W. grabbed its blade, too, which also broke from the handle. Lenoir began throwing dishes and glass canisters at D. W. When she tried to run outside, Lenoir grabbed her by her hair. He turned over the kitchen table. And when she eventually fell to the floor, he picked up a chair and beat her on the head with it. D. W. sought refuge in her son's room, but Lenoir followed her and began striking her in the face and on her head with a piece of the wooden picture frame. Then he pulled her back into their bedroom and stomped on her stomach.

D. W. screamed for her son to "go get mommy some help," and although the boy tried to run out the front door, he could not open it – Lenoir had secured the door

with a chain, which the boy could not reach. D. W. told her son to call 911, but he could not place a call on the telephone, which was cordless – Lenoir had removed the battery.

Using one hand to hold D. W. by her hair, Lenoir used his other hand to flip a table onto its side, then to pry off its leg. Then he beat D. W. on her head with the table leg. D. W.'s son remained at his mother's side, screaming. Still holding the table leg, Lenoir told D. W., "If you let me stick this in you, it will all be over with." D. W. recalled that, when she refused, "he tried to stick it in me . . . . I was laying on my back, but when he was trying I was fighting and I turned over. . . [A]fter I turned over, . . . I had my legs closed, and he just was trying to stick the table leg up in me."

The attack had been going on for over an hour. Bleeding profusely, D. W. began to feel dizzy, as though she would pass out. Lenoir retrieved a bottle of rubbing alcohol and poured it over D. W.'s lacerated body. D. W.'s son was begging Lenoir not to kill his mother. D. W. passed out, and when she awakened, Lenoir, her son, and her car were gone. She went to her neighbor's house, and her neighbor took her to a hospital.

Meanwhile, Lenoir had driven to a friend's house. That friend testified that, between 6:00 and 7:00 a.m. on June 21, 2003, Lenoir appeared at his door wearing

4

bloody clothing. He had with him D. W.'s son. Lenoir told his friend that he had "messed up" and that he was leaving. Lenoir left D. W.'s son with his friend, instructing the friend to call the child's maternal grandmother. Lenoir's friend quickly delivered the boy to his grandmother.

An emergency room doctor testified that D. W. arrived with multiple facial fractures and fractures to her arm and a finger. She had contusions in both eyes, as well as contusions all over her body. Her eyes were closed from the swelling, and she had multiple abrasions and lacerations on her face. He summarized that "she looked like a victim of a car crash."

A detective from the sheriff's office went to the hospital at about 7:00 a.m. to interview D. W. "[H]er face was completely bloody," he described. There were severe lacerations across her face; there was massive swelling around her eye, cheek, and neck areas; and blood had matted her hair to her head. D. W.'s lacerated hands were dripping blood to the floor. There were bruises on her arms and legs, lacerations on her inner knee, and bruises on her thighs. The detective took photographs of D. W.'s injuries, and those photographs were later shown to the jury.

While the detective was interviewing D. W., her son was brought to the hospital. While interviewing the boy, the detective observed on the child's shirt and

5

shoes what appeared to be spots of blood; also, one of his legs had a laceration, and he had a bruise on his forehead. The detective took photographs of the child's shirt, shoes, laceration, and bruise, which photographs were later shown to the jury.

That same day, June 21, 2003, a crime scene investigator[1] went to D. W.'s residence. He testified that, when he walked into the house, he detected a strong odor of bleach. Strewn about the house, he found, inter alia, overturned furniture; broken furniture, including a table that was missing a leg; a bloody, detached table leg; bloody pieces of a picture frame; clumps of hair that appeared to have been pulled out of someone's head; a blood-stained, nearly empty bottle of bleach; broken china; a broken cordless telephone; a broken cordless telephone base; a battery that appeared to fit a cordless phone; and "a phone jack that appeared to have been pulled off a wall." There were blood stains throughout the house, including upon a wall leading to a child's bedroom. The jury was shown numerous photographs depicting D. W.'s residence in the state the investigator found it. The jury was also presented an audiovisual recording of the damage done to D. W.'s residence, which recording had been captured (and narrated) by the detective.

---

[1] The trial court ruled that this individual was qualified to testify as an expert in crime scene investigations.

6

Later, on the date of the attack, D. W.'s car was located at a wrecker yard. Lenoir was not apprehended until about a month thereafter. While Lenoir was being transported to the county jail, the detective who had interviewed D. W. at the hospital read Lenoir Miranda rights. According to the detective, "[Lenoir] did not speak at all in any shape, form or fashion." When they reached the detective's office and the detective again read Lenoir Miranda rights, Lenoir refused to sign the form; he stated, however, that he might sign the form later, but wanted first to consult with an attorney. The detective did not pursue the interview further.

Several days later, Lenoir informed the detective that he wished to tell his side of the story. At the start of the ensuing interview, the detective read Lenoir Miranda rights, and Lenoir gave his version of events of the early morning in question. Lenoir said that he and D. W. had argued, and the argument had erupted into a physical altercation – they began fighting each other. He described, "I just lost it," recounting that during the time of the physical altercation, "I didn't know it was that bad." Lenoir admitted that he had blocked D. W. when she tried to flee the house, that he had damaged items within the residence, and that D. W.'s son had witnessed most of the physical altercation. Lenoir denied, however, using a table leg to (attempt to) penetrate D. W.'s body, and he denied interfering with anyone's attempt to place a

7

911 call, recalling that the cordless telephone broke apart because he threw it at D. W. Lenoir's interview with the detective was captured by audiovisual recording, which was played for the jury.

Lenoir neither took the stand nor called any witnesses. The jury found him guilty of: aggravated battery against D. W.;[2] sexual battery against D. W.;[3] false imprisonment of D. W.;[4] criminal damage to D. W.'s property in the second degree;[5] cruelty to children in the second degree;[6] and interference with placing a 911 telephone call.[7]

1. Lenoir contends that the evidence was insufficient to sustain his conviction for criminal damage to property in the second degree.

OCGA § 16-7-23 (a) defines, "A person commits the offense of criminal damage to property in the second degree when he . . .[i]ntentionally damages any

---

[2] OCGA § 16-5-24 (a).

[3] OCGA § 16-6-22.1 (b).

[4] OCGA § 16-5-41 (a).

[5] OCGA § 16-7-23 (a) (1).

[6] OCGA § 16-5-70 (c).

[7] OCGA § 16-10-24.3.

property of another person without his consent and the damage thereto exceeds $500.00." Lenoir was alleged to have committed this crime by "unlawfully and intentionally damag[ing] the property of [D. W.], to wit: household items and furniture, without the said person's consent, said damage exceeding $500.00."

Citing *Waldrop v. State*,[8] Lenoir argues that the state failed to prove that he was guilty of that crime because "[n]o evidence was presented . . . as to the value of the property." The state responds that it "cannot find any evidence in the record as to presentation of the evidence regarding the value of the property" and thus posits that Lenoir is entitled to relief from that conviction.

When an appellant challenges the sufficiency of the evidence to support a conviction, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."[9] Having examined the

---

[8] 231 Ga. App. 164 (498 SE2d 337) (1998) (whole court) (declining to accept view concerning "proof of damage" offered by the dissent).

[9] *Jackson v. Virginia*, 443 U. S. 307, 319 (III) (B) (99 SCt 2781, 61 LE2d 560) (1979).

evidence in that light, we conclude that, under cases such as *Waldrop*,[10] "there was no competent evidence from which the jury could determine that the value of the damage for which defendant was responsible was in excess of $500, an essential element of the indicted crime, and [Lenoir's] conviction for damaging [D. W.'s household property] must, therefore, be reversed."[11]

2. Lenoir contends that his aggravated battery conviction should be reversed, asserting that the trial court "overcharged" the jury when defining that offense during the final charge.

OCGA § 16-5-24 (a) defines, "A person commits the offense of aggravated battery when he or she maliciously causes bodily harm to another by depriving him or her of a member of his or her body, by rendering a member of his or her body useless, or by seriously disfiguring his or her body or a member thereof." Lenoir was

---

[10] See, e.g., *Mack v. State*, 255 Ga. App. 210, 214 (3) (564 SE2d 799) (2002), citing *Waldrop*, supra at 166; *Bereznak v. State*, 223 Ga. App. 584-585 (1) (478 SE2d 386) (1996) (explaining that, where the state gave the jury no evidence of purchase price and no competent opinion testimony which jurors could use as a basis for applying their everyday experience and reaching a value for damaged items in excess of $500, the evidence was insufficient to support conviction for criminal damage to property in the second degree).

[11] *Mack*, supra (punctuation and footnote omitted); see *Waldrop*, supra; *Bereznak*, supra.

alleged to have committed battery by "maliciously caus[ing] bodily harm to the person of [D. W.], by seriously disfiguring her body by causing severe lacerations to her scalp and face, by repeatedly striking her in the head with a wooden table leg and broken wooden picture frame." And as Lenoir points out, the trial judge minimally tailored the statutory provision defining that crime, hence instructing the jury, "A person commits the offense of Aggravated Battery when he or she maliciously causes bodily harm to another by depriving her of a member of her body, by rendering a member of her body useless, or by seriously disfiguring her body or any member thereof."

Pretermitting whether Lenoir's lawyer at the 2004 trial waived the issue by neither objecting to that instruction nor reserving objections for later,[12] the trial court committed no harmful error.

> Where the indictment charges a defendant committed an offense by one method, it is reversible error for the court to instruct the jury that the offense could be committed by other statutory methods with no limiting instruction. *The defect is cured, however, where the court provides the jury with the indictment and instructs jurors that the burden of proof*

---

[12] See generally *Brown v. State*, 291 Ga. 750, 754 (4) (733 SE2d 300) (2012) (concluding that failure to object to jury charge amounts to waiver in trials occurring prior to July 1, 2007).

11

*rests upon the State to prove every material allegation of the indictment and every essential element of the crime charged beyond a reasonable doubt.*[13]

The record reveals that the trial court provided the jury with the indictment and instructed the jurors that the burden of proof was with the state to prove every material allegation of the crimes charged in the indictment and every essential element of each such crime beyond a reasonable doubt. Therefore, because "any error in overcharging the jury on aggravated [battery] was cured,"[14] Lenoir cannot show harmful error as would be required for a reversal as to this offense.[15]

3. Lenoir contends that the trial court erred by rejecting his claim that he received ineffective assistance of counsel.

> To prevail on his ineffective assistance claim, [Lenoir] must show that his trial counsel provided deficient performance and that, but for that unprofessional performance, there is a reasonable probability that the outcome of the proceeding would have been different. In examining an ineffectiveness claim, a court need not address both components of the

---

[13] *Williams v. Kelley*, 291 Ga. 285, 286-287 (728 SE2d 666) (2012) (emphasis in original; punctuation omitted).

[14] Id. at 287.

[15] See *O'Neal v. State*, 288 Ga. 219, 223 (2) (702 SE2d 288) (2010) ("[I]t is fundamental that harm as well as error must be shown for reversal.").

12

inquiry if the defendant makes an insufficient showing on one. In particular, a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies.[16]

Lenoir maintains that his trial lawyer erred in three respects.

(a) Lenoir complains that his trial lawyer neither objected to the "overcharge" instruction on aggravated battery nor reserved opportunity to later object. But by the end of the final charge, any harmful effect that potentially stemmed from the cited language was cured.[17] We find no professional deficiency.

(b) Lenoir complains that his trial lawyer did not object when, as he asserts, the detective improperly commented on his silence. Specifically, Lenoir cites the detective's testimony that: (i) after Miranda rights were read to him during transport to the county jail, he said nothing; and (ii) after Miranda rights were read to him in the detective's office, he asked for a lawyer.

---

[16] *Long v. State*, 287 Ga. 886, 891 (4) (700 SE2d 399) (2010), citing *Strickland v. Washington*, 466 U. S. 668 (104 SCt 2052, 80 LEd2d 674) (1984).

[17] See Division 2, supra.

"Certainly, the fact that a defendant has exercised the right to remain silent is not to be used against the defendant at trial."[18] Pretermitting whether trial counsel erred by failing to lodge an objection to the cited evidence,[19] Lenoir cannot prevail on his ineffectiveness claim.[20] "As for the prejudice prong of [Lenoir's] ineffectiveness claim, we note that an improper comment on a defendant's silence may be harmless error, where, as here, there is overwhelming evidence of guilt."[21]

(c) Lenoir complains that his trial lawyer did not object to what he claims was bolstering of the credibility of the crime scene investigator.

---

[18] *Whitaker v. State*, 283 Ga. 521, 524 (3) (661 SE2d 557) (2008) (citation omitted).

[19] See, e. g., *Rowe v. State*, 276 Ga. 800, 805 (4) (582 SE2d 119) (2003) (determining that Fifth Amendment rights were not violated by evidence that defendant invoked his right to counsel, where defendant invoked that right after giving a lengthy statement to police at which point the interview was properly terminated, and it did not purport to be evidence of his guilt nor was it directed to undermining any of his defenses).

[20] See further Division 3 (c), infra. *Schofield v. Holsey*, 281 Ga. 809, 811 (II), n. 1 (642 SE2d 56) (2007) (holding that the combined effect of trial counsel's deficiencies should be considered).

[21] *Pearson v. State*, 277 Ga. 813, 817 (5) (c) (596 SE2d 582) (2004) (citation and punctuation omitted); see *Wright v. State*, 275 Ga. 427-428 (2) (569 SE2d 537) (2002), overruled on other grounds, *Wilson v. State*, 277 Ga. 195, 199 (2) (586 SE2d 669) (2003).

14

During its effort to show that this witness should be qualified by the court as an expert in crime scene investigation, the state asked this witness, "And have your process of crime scenes led to convictions of defendants?" The witness answered, "Yes, they have." Pretermitting whether the answer amounted to impermissible bolstering, we conclude that Lenoir has failed to demonstrate the requisite prejudice.

> "[E]ven if we concluded that trial counsel performed unprofessionally in failing to lodge the additional objections now urged by [Lenoir], [his] ineffective assistance of counsel claim still fails. The evidence of [his] guilt was overwhelming, and [he] failed to demonstrate that but for the [single response cited here and the testimony cited in Division 3 (b)[22]] discussed above, there is a reasonable probability that the outcome of the trial would have been more favorable to [him]. Consequently, [Lenoir has] failed to establish the requisite prejudice to support an ineffective assistance of counsel claim.[23]

*Judgment affirmed in part and reversed in part. Ellington, P. J., and Branch, J., concur.*

---

[22] Supra.

[23] *Smith v. State*, 284 Ga. 599, 603-604 (2) (a) (669 SE2d 98) (2008); see *Schofield*, supra.