NOTICE: This opinion is subject to modification resulting from motions for reconsideration under Supreme Court Rule 27, the Court's reconsideration, and editorial revisions by the Reporter of Decisions. The version of the opinion published in the Advance Sheets for the Georgia Reports, designated as the "Final Copy," will replace any prior version on the Court's website and docket. A bound volume of the Georgia Reports will contain the final and official text of the opinion.

In the Supreme Court of Georgia

Decided: May 16, 2023

S23A0259. BLALOCK v. THE STATE.

LaGrua, Justice.

Appellant Dwight Blalock, Jr., was convicted of malice murder and other crimes in connection with the fatal shooting of Carlos Wright and the aggravated assault of Bryan Morrow on November 13, 2014.[1] On appeal, Blalock contends that (1) the trial court

---

[1] On March 3, 2017, Blalock was indicted by a Cobb County grand jury on charges of malice murder, two counts of felony murder, two counts of aggravated assault, and two counts of possession of a firearm during the commission of a felony. On May 26, 2017, the State filed a superseding indictment, adding one count of violation of the Georgia Street Gang Terrorism and Prevention Act and one count of felony murder predicated on violation of the Criminal Street Gang Act. In June 2017, a jury found Blalock guilty of all counts. The trial court sentenced Blalock to serve life in prison without the possibility of parole for the malice murder count, plus 35 years to run concurrently for one of the aggravated assault counts and the gang count, plus an additional 10 years consecutive for the firearms counts. The felony murder counts were vacated by operation of law, and one of the aggravated assault counts merged with the malice murder count for sentencing purposes. On July 10, 2017, Blalock filed a motion for new trial, which he amended through new counsel on June 24, 2020. Following an evidentiary hearing, the trial court denied Blalock's motion for new trial on May 18, 2022. Blalock filed a timely notice of appeal to this Court, and the case was docketed to the term of this

abused its discretion and denied Blalock due process by refusing to grant his motion for continuance; (2) Blalock's trial counsel rendered ineffective assistance by failing to argue that the discovery statute, OCGA § 17-16-4, was unconstitutional as applied in this case; and (3) the trial court erred in permitting a State's witness to comment on Blalock's silence. For the reasons that follow, we affirm Blalock's convictions.

The evidence presented at Blalock's trial[2] showed that, on the evening of November 13, 2014, Wright and Morrow were interested in purchasing cocaine, so Wright contacted his neighbor, Savante Hubbard, who had set up a cocaine purchase for Wright a few weeks earlier. On that occasion, Hubbard had arranged for Wright to buy cocaine from Blalock, and then, Hubbard, Wright, and Muriel Johnson—Wright's girlfriend—drove to a nearby apartment

---

Court beginning in December 2022 and submitted for a decision on the briefs.

[2] "In light of the harmless-error analysis we undertake in Division [3] of this opinion, we review the record de novo, and we weigh the evidence as we would expect reasonable jurors to have done [] as opposed to viewing it all in the light most favorable to the jury's verdict." *Moore v. State*, 315 Ga. 263, 264 (1) n.2 (882 SE2d 227) (2022) (quotation and punctuation omitted).

2

complex to complete the sale with Blalock.[3]  According to Hubbard, a few days after that transaction, Blalock called him and said that one of the five dollar bills Wright had given him during the sale was "counterfeit."  Blalock told Hubbard, "I thought we were cooler than that to let somebody get down on me for $5.00."  Hubbard replaced the five dollar bill, feeling "obligated" to do so because he "brought [Wright] over there" and still had "intentions of dealing with [Blalock]."

On the night of November 13, Wright called Hubbard and asked if Hubbard could set up a cocaine purchase for him again. Hubbard was not available to go with Wright that night, and he was "cautious" about reconnecting Wright and Blalock because he did not want Wright to "try the same thing and try to give [Blalock] fake money again."  But Hubbard agreed to put Wright in touch with Blalock.  At that time, Blalock did not have a working cell phone, so

---

[3] Following Blalock's arrest in this case, Johnson was shown a photographic lineup and asked if she could identify the man Wright purchased cocaine from in October 2014.  Johnson selected Blalock's picture from the lineup, and Johnson identified Blalock again at trial.

Hubbard called Jeremy Dyer—a friend of Blalock's who often let Blalock use his phone—and spoke to Blalock about setting up another deal with Wright. According to Hubbard, Blalock agreed to sell to Wright and did not "say anything" about "the $5.00 bill incident." However, Hubbard was "concerned about putting them together" because he "knew what kind of guy" Blalock was and "had these concerns" about what Blalock might do.

At trial, Johnson testified that she overheard Wright speaking to Blalock on the phone that evening, arranging a meeting time for later that night. Around 10:00 p.m., Wright and Morrow left Wright's apartment to meet Blalock. Wright drove Morrow's car—a 2013 brown Honda Civic—because he was more familiar with the Bellemeade area. According to Morrow, he and Wright drove to a duplex located at 816-B Bellemeade Way and parked in the adjacent cul-de-sac.[4] Wright then called his contact—Morrow did not actually

---

[4] Dyer and Dyer's girlfriend, Latoya Ross, lived at 816-B Bellemeade Way with their children, and Dyer testified that Blalock frequently hung out there. Neighbors described 816-B as a "dope house" and a "drug hangout" that was "filled with people running drugs."

know the identity of the person at that time—to say that "he was outside." Morrow testified that, seconds later, someone wearing a red hoodie approached the back side of the vehicle and started shooting, walking around the front of the car towards the driver's side. The shooter "shot up the glass" on the driver's side, and Wright and Morrow "both got down." Morrow got out of the car and ran towards the duplex and through the adjacent woods, hearing shots as he ran away.

Officers with the Marietta Police Department responded to the scene between 10:45 and 11:00 p.m. on November 13 and observed a man—later identified as Wright—lying face-down in the cul-de-sac just outside the driver's side door of a brown Honda Civic. Officers rolled Wright's body over, cut his shirt off, and discovered "two entrance wounds" in his torso. The medical examiner testified at trial that Wright died at the scene from "a gunshot wound to the torso with perforations of the lungs, heart, and liver."

Detective Lee Greene was called to process the scene. He located two 7.62-millimeter shell casings on the driver's side of the

vehicle and two .380-caliber shell casings on the passenger side of the vehicle, which he testified would have been fired from a 7-millimeter handgun and .380-caliber handgun, respectively. Detective Greene also observed bullet holes in both sides of the vehicle. On this basis, Detective Greene determined that there were two shooters involved in the shooting—one shooter who was using a 7-millimeter handgun and another who was using a .380-caliber handgun. No weapons were recovered at the scene or inside the vehicle, and neither weapon was ever found. Morrow testified that neither Wright nor Morrow was carrying a weapon that night, and at trial, Morrow identified Blalock as one of the shooters.

One of the detectives who canvassed the crime scene area after the shooting observed "fresh" saliva—where someone apparently spit on the ground—near the walkway leading to 816-B Bellemeade Way. The detective collected a sample of the saliva, and subsequent GBI testing determined it to be a match for Blalock's DNA.

Detective Michael Selleck, who also responded to the scene that night, testified that a man approached him while he was

6

standing near the shooting location and motioned for him to walk over to "a darker back corner of the cul-de-sac." The man identified himself as Lee Hill and told Detective Selleck that "Blalock, that is your guy," and "if anybody hears me saying this, you will find me in a ditch." At trial, Hill testified that he heard about the shooting on the night of November 13, and shortly afterwards, Blalock came to his house and told him, "I did it." Hill admitted that he went up to the crime scene area afterwards and spoke to a detective, and while he could not recall saying "Blalock" is "your guy," he did tell "the truth" when he said, "If anyone hears me telling you this, you will find me in a ditch." Hill also testified that he had seen Blalock wearing a red hoodie earlier in the day.

Dyer also testified at trial. According to Dyer, around 9:00 or 9:30 p.m. on November 13, Blalock was hanging out with Dyer and some other friends at Dyer's house, and Dyer let Blalock use his phone, which he did "fairly often." At some point, Blalock told Dyer that "he was going to go outside to catch a Joe," which Dyer testified meant to "sell drugs" to someone. About 10 or 15 minutes later, Dyer

7

heard gunshots. Dyer stepped outside after the shooting stopped and saw Wright lying in the cul-de-sac. At trial, Dyer testified that he did not see Blalock with a gun that night, but he knew Blalock owned and carried a 7-millimeter handgun—a gun Dyer had "never heard of" until he saw Blalock with one.

Detective Michael Merritt, the lead investigator in this case, testified that, on November 14, he interviewed several of the witnesses who were in the area that night, including Morrow, Hill, and Dyer. Based on those interviews, Detective Merritt identified Blalock as a possible suspect in the shooting. On November 15, officers located Blalock at an apartment in Cobb County with O'Reicha Usher, his girlfriend, and Gerald Florence, his cousin. Florence and Blalock were detained and taken to police headquarters for questioning. During Blalock's interview, Blalock did not deny being at 816-B Bellemeade Way on November 13, but said he left prior to the shooting. Blalock also denied knowing or ever having met Wright. Florence also denied any knowledge of the crime or Blalock's potential involvement in the crime. Detective

8

Merritt testified that he did not take out an arrest warrant for Blalock at that time because he wanted to acquire more information.

On December 6, 2016, Florence was arrested in Cobb County on an unrelated matter and was interviewed by Detective Merritt again. At trial, Florence testified that, at this point, he had decided to give Detective Merritt "what he want[ed]" to "get it off [his] conscience." Florence told Detective Merritt that, on the night of November 14, 2014, Florence went to Blalock's apartment, and Blalock told Florence that "he shot that man off Bellemeade Way" the night before. Blalock said that Wright had tried to rob him, so he shot him, and after the shooting, Blalock "fled to the home of Lee Hill." According to Florence, Blalock then asked for a ride back over to the Bellemeade area, and Florence drove Blalock and Usher to Hill's house. When they arrived, Blalock and Usher went through "a pathway" between Hill's house and 816-B Bellemeade Way "where the shooting occurred." Usher came out carrying a bag, which she handed to Blalock, and Florence understood there was a gun in the bag. Florence, Blalock, and Usher then left in Florence's

9

truck. On the way back to Blalock's apartment, Blalock "pulled the gun out" and "threw the clip" out of the window, and Blalock asked Florence to stop at Fair Oaks Park, where Blalock threw the gun somewhere in the woods. Florence testified that, during this timeframe, Blalock carried a 7-millimeter handgun. Blalock was arrested shortly after Florence's interview.

At trial, Agent Paul Reynolds—a gang investigator who testified for the State as an expert in criminal street gangs, criminal street gang activity, and criminal street gang identification—testified that, based on Blalock's body tattoos and his relationship to Florence—Blalock's cousin who was a known member of the Bloods, specifically, the "Bounty Hunter Blood[s]"—Blalock was "a member[,] or at least at a minimum[,] an associate to the Bloods criminal street gang."

1. On appeal, Blalock contends that the trial court abused its discretion and violated Blalock's due process rights by refusing to grant his request for a continuance after he received a large amount

10

of discovery from the State 13 days before trial. We see no merit to this claim.

The record reflects that Blalock was indicted on March 3, 2017, and on April 3, 2017, he filed a statutory demand for speedy trial. On April 7, 2017, Blalock filed 21 motions—16 of which were related to discovery. On April 20, 2017, the State requested and Blalock delivered approximately 40 blank compact discs to the State for purposes of copying the State's discovery in this case. The State returned one of the discs with discovery on it to Blalock on April 21, 2017.

On April 25, 2017, during Blalock's formal arraignment hearing, the trial court noted Blalock's speedy trial demand and inquired whether the parties would like "to go ahead and have a specially set [trial] date." Both sides responded affirmatively, and the trial court advised that it would specially set trial for June 19, 2017. The prosecutor informed the trial court that "there might be a superseding indictment" involving "some gang act charges," but the State would still "be ready on the 19th on that charge." Defense

counsel responded that "any superseding indictment involving gang activity" could affect Blalock's "ability to go forward on June the 19th." The trial court inquired whether Blalock might "withdraw [his] speedy trial demand," and defense counsel responded that he was "not saying that right now." The trial court reiterated that it had specially set trial for June 19.

On May 15, 2017, Blalock filed a motion to compel the State's responses to Blalock's discovery motions, and the trial court heard the motion on May 25. At the hearing, defense counsel argued that he had only received one compact disc of discovery from the State, and the prosecutor responded that the State did "not plan on giving discovery" on this indictment because the State "expected that the Grand Jury would be considering additional charges including violation of the Gang Act." The prosecutor advised the trial court that, once he had the new case number, the State would "comply with discovery as the statute requires."

Defense counsel inquired whether the new indictment would "eliminate the trial scheduled for June the 19th," and the trial court

responded that trial would still likely proceed at that time unless Blalock withdrew his speedy-trial demand. Defense counsel did not indicate that Blalock would be withdrawing his speedy-trial demand, and he asked the trial court to rule on Blalock's motion to compel and require the State to turn over discovery on the current indictment immediately. The prosecutor argued that the State did "not want to provide discovery on an indictment" that would be nolle prossed, and if Blalock opted into "reciprocal discovery on the new case for the 19th," then the State would turn over discovery in accordance with the discovery statute. The trial court advised Blalock that it was denying the motion to compel at that time because the State would be "go[ing] forward on a different indictment," for which Blalock would need to opt into discovery again, and the trial court further noted that because Blalock "filed the speedy trial demand," it meant he was "ready for trial" and to "try me just as soon as you can."

The superseding indictment was filed on May 26, 2017, adding one count of felony murder and one count of violation of the Street

13

Gang Terrorism and Prevention Act.[5]  On June 2, Blalock was formally arraigned on the new indictment, and defense counsel advised the trial court that he wanted to "revisit this discovery issue," asking the trial court to order the State to turn over discovery immediately since Blalock had opted into discovery on the new indictment, as well.  The prosecutor indicated that the State would turn over discovery "as soon as possible."  The trial court set a motions hearing for June 16.

On June 6, the State produced discovery to Blalock on 37 compact discs.  On June 14, Blalock filed a withdrawal of his demand for speedy trial.  On June 15, Blalock filed a motion for continuance, seeking a continuance of the trial set for June 19 based on the volume of discovery the State produced.

At the motions hearing on June 16, defense counsel advised the trial court that Blalock had withdrawn his demand for speedy trial as of June 14, and the trial court indicated it had not been made

---

[5] The other charges from the original indictment were also included in the superseding indictment.

14

aware of the withdrawal. Defense counsel argued that there was "absolutely no way [they could] actually prepare [for trial] with the breadth of information" provided by the State, and defense counsel did not "know of a competent attorney that would announce ready for trial on a murder case that has gang-related issues to it." Defense counsel further argued that "there [was] no time to prepare for this case in a proper fashion" because they "need[ed] time to interview witnesses to determine whether or not their testimony [was] credible and whether [they] need[ed] to put them under subpoena" and "just [didn't] have the time to do it."

The prosecutor responded that Blalock could have withdrawn the speedy-trial demand "weeks ago," but waited until right "before the start of a specially-set trial." The prosecutor argued that it was "the defense's strategic choice of filing a demand" for a speedy trial— which was "an assertion that the defense [was] ready for trial"—and then immediately filing for discovery. The prosecutor asserted that the State's discovery was "timely" and "in excess" of the ten days required by statute, having been turned over 13 days before trial.

15

See OCGA § 17-16-4 (a) (3) (A).[6] The prosecutor also argued that Blalock's "filing [of] a speedy trial demand and withdrawing [it] at the last minute" was a "strategic maneuver" Blalock should not be allowed to use to "force the State into a position of [] hurrying up and getting ready and going out and subpoenaing witnesses," to only be informed "at the last minute" that a speedy trial was "not really what [the defense] want[ed]." The prosecutor emphasized that Blalock had been in possession of the State's timely discovery "for the better part of almost a week now" and reiterated that the State was "ready for trial."

In response, defense counsel argued that "[t]he State essentially want[ed] to punish Mr. Blalock for exercising his right to

---

[6] Pursuant to OCGA § 17-16-4 (a) (3) (a),

the prosecuting attorney shall, no later than ten days prior to trial, or as otherwise ordered by the court, permit the defendant at a time agreed to by the parties or ordered by the court to inspect and copy or photograph books, papers, documents, photographs, tangible objects, audio and visual tapes, films and recordings, or copies or portions thereof and to inspect and photograph buildings or places which are within the possession, custody, or control of the state or prosecution and are intended for use by the prosecuting attorney as evidence in the prosecution's case-in-chief or rebuttal at the trial or were obtained from or belong to the defendant.

16

file a speedy demand for trial," and that defense counsel did not "have time to prepare" and "need[ed] a continuance." The trial court observed that it "thought this might be what [Blalock] might attempt to do, but [the trial court's staff] moved Heaven and Earth to get the case tried next week." The trial court denied the motion for continuance and advised that trial would proceed on June 19. The trial proceeded as scheduled.

In denying Blalock's motion for new trial, the trial court held that it did not abuse its discretion in denying Blalock's motion for continuance because: (1) there was no discovery violation by the State given that the State provided all of its discovery to Blalock more than ten days prior to trial; (2) Blalock's argument that he did not have adequate time to review the discovery or prepare for trial was "belied by the entirely reasonable strategy that [Blalock] was able to employ during the trial and by the excellent performance of his well-seasoned trial counsel, who had decades of experience and who had tried hundreds of felony criminal jury trials"; (3) Blalock was required to show that he was harmed by the denial of the motion

17

for continuance and failed to do so; and (4) the gang expert and the crime scene expert Blalock presented at the motion for new trial hearing did not proffer any testimony which, had it been offered at trial, would have affected the outcome of the trial with any "reasonable probability," especially in light of "the overwhelming evidence" of Blalock's guilt.[7]

On appeal, Blalock contends that the trial court abused its discretion by refusing to grant his motion for continuance, asserting the following: (1) Blalock exercised due diligence "in consistently bringing the issue of no discovery before the trial court" and "confront[ing]" the trial court with "the dire situation regarding the discovery," but the trial court denied Blalock's motion to compel discovery and his motion for continuance, improperly relying solely

---

[7] At the motion-for-new-trial hearing, the gang expert stated that he would have testified at trial that Blalock's gang-related tattoos looked faded and did not necessarily indicate that Blalock was a gang member at the time the crimes were committed. The crime scene expert stated that he would have testified that Morrow, the passenger in Wright's car, was likely the second shooter. In denying Blalock's motion for new trial, the trial court noted that the gang expert's testimony was "common sense" and that Blalock "was able to present a cogent, reasonable defense even without the crime scene expert's testimony."

on Blalock's speedy-trial demand; (2) while "the State did comply with the letter of the law" in turning over discovery, the State "outwardly refused to give discovery for months" and "waited until the last minute to provide this massive amount of discovery"; (3) because of the State's "intentional delay," the defense was "tactically prevented" from conducting important deliberation and preparation for trial; and (4) if Blalock had been given more time to prepare, he would have consulted a gang expert and ballistics expert to testify for the defense at trial, and he was "greatly harmed" by being precluded from doing so.

> In considering a motion for continuance, the trial court enjoys broad discretion and may grant or refuse the motion as the ends of justice may require. To obtain a new trial based upon the denial of a motion for continuance, an appellant must show not only a clear abuse of discretion on the part of the trial court in denying the motion but also that he was harmed by that denial.

*Mann v. State*, 307 Ga. 696, 703 (2) (d) (838 SE2d 305) (2020) (citations and punctuation omitted). See also *Terrell v. State*, 304 Ga. 183, 185 (2) (815 SE2d 66) (2018) ("[R]equests for continuances are addressed to the sound discretion of the trial court, and this

19

Court will not interfere unless there was a clear abuse of discretion." (citing OCGA § 17-8-22[8])). Blalock has not met this burden.

Our review of the record demonstrates that the trial court considered several factors in denying Blalock's request for a continuance, including the trial court's special setting of the trial date (and the efforts of its staff to accommodate that setting) to comply with Blalock's speedy-trial demand under OCGA § 17-7-171—which Blalock did not withdraw until a few days before trial and which was the impetus behind the shortened timeframe for trial—as well as the fact that Blalock's demand for a speedy trial was an assertion that he was ready for trial. See *Higuera-Hernandez v. State*, 289 Ga. 553, 559 (3) (714 SE2d 236) (2011) (concluding that "it was apparent by his demand for trial [that] Appellant had shortened the time for trial[,] which constituted a factor for the trial court to consider when setting the trial date," and

---

[8] OCGA § 17-8-22 provides in pertinent part: "All applications for continuances are addressed to the sound legal discretion of the court and, if not expressly provided for, shall be granted or refused as the ends of justice may require."

the trial court's prompt setting of the trial date was its attempt "to comply with the demand for trial" (citation and punctuation omitted)). See also *Dalton v. State*, 269 Ga. 138, 140 (429 SE2d 89) (1993) (noting that, when the defendant filed a speedy-trial demand, the trial court's special setting of "the date of trial such that it would be timely held" was the trial court's "scrupulous[] attempt[] to comply with the defendant's demand that he be brought to trial expeditiously," and the defendant's subsequent "motion for continuance of this trial date" was an "affirmative action to ensure that his trial could not be held within two terms of his demand for a speedy trial"). The trial court also determined that the State timely provided discovery to Blalock in accordance with OCGA § 17-6-4 (a) (3) (A). "Given these facts, we cannot say that the trial court abused its discretion in denying" Blalock's "motion for continuance." *Mann*, 307 Ga. at 703 (2) (d).

Moreover, in considering the issue of the continuance at Blalock's motion for new trial hearing, the trial court assessed the expert testimony that Blalock argued he would have introduced at

21

trial had a continuance been granted and concluded that Blalock failed to show that he was harmed by the trial court's denial of his request for a continuance or that the outcome of his trial would have been different had this evidence been admitted. See *Mann*, 307 Ga. at 703 (2) (d). We agree.

As noted above, "to be entitled to a new trial based upon the denial of a motion for a continuance, a defendant has the burden to show that he was harmed by that denial." *Phoenix v. State*, 304 Ga. 785, 788 (2) (822 SE2d 195) (2018) (citation and punctuation omitted). Here, even if the trial court had abused its discretion in denying the motion for continuance, Blalock has "made no showing that this was harmful error." Id. Although Blalock argues that a continuance was necessary to give his counsel an opportunity to consult experts to potentially testify on his behalf at trial, Blalock has not shown that this testimony would have helped him "formulate an effective defense" or "how the testimony would [otherwise have] benefit[ed] him" had it been presented at trial. Id. Under these circumstances, even if the trial court abused its

22

discretion in denying the requested continuance, the denial was not harmful to Blalock.

Blalock also contends that the trial court's denial of his motion for continuance violated his right to due process of law by "forcing the case to trial" too quickly and denying Blalock the "effective representation of defense counsel" as a result. We disagree.

As noted above, approximately one month after he was indicted, Blalock filed a demand for a speedy trial, which meant he was ready for trial and the State was required to try him within the requisite timeframe. See OCGA § 17-7-171 (b) (providing that "[i]f more than two regular terms of court are convened and adjourned after the term at which the demand for speedy trial is filed and the defendant is not given a trial, then the defendant shall be absolutely discharged and acquitted of the offense charged in the indictment"). See also *State v. Varner*, 277 Ga. 433, 434 (589 SE2d 111) (2003) (explaining that "[t]he demand for trial statutes, OCGA §§ 17-7-170 and 17-7-171, are regarded as in aid and implementation of the State constitutional right to a speedy trial," and "[w]hen the State is

23

unable to meet its statutory requirement to try a defendant who has timely filed a compliant demand, the statute exacts a heavy toll—the absolute discharge and acquittal of that defendant"). During Blalock's formal arraignment hearing, the trial court specially set Blalock's trial to comply with his speedy-trial demand, and the State advised that it would likely be filing a superseding indictment with additional "gang act" charges, which would not interfere with the scheduled trial date. The trial court then inquired whether Blalock would be withdrawing his speedy-trial demand on this basis, and Blalock indicated he would not be doing so. Over the next several weeks, even after the superseding indictment was filed, Blalock did not withdraw his speedy-trial demand, waiting until a few days before the specially-set trial to do so. Accordingly, given that Blalock chose not to withdraw his speedy-trial demand when given the opportunity to do so and his delay in withdrawing the demand until shortly before his trial was scheduled to commence, we see no violation of Blalock's due process rights in the trial court's denial of his motion for continuance. For this additional reason, this

24

enumeration of error fails.[9]

2. Blalock also contends that his trial counsel rendered ineffective assistance by failing to argue that the discovery statute, see OCGA § 17-16-4 (a) (3) (A), was unconstitutional as applied in this case. We conclude that Blalock failed to demonstrate that his trial counsel was constitutionally ineffective.

"To prevail on a claim of ineffective assistance of counsel, a defendant generally must show that counsel's performance was deficient, and that the deficient performance resulted in prejudice to the defendant. *Moss v. State*, 311 Ga. 123, 126 (2) (856 SE2d 280) (2021) (citing *Strickland v. Washington*, 466 U.S. 668, 687-695 (104 SCt 2052, 80 LE2d 674) (1984)). "To prove deficient performance," a defendant "must show that his counsel performed in an objectively

_____

[9] While we recognize that, in a criminal case like this one, there may be valid strategic reasons for delayed action, we remind defense attorneys and prosecutors alike that trial strategy need not, and should not, require counsel to compromise their ethical obligations to practice law with a high degree of professionalism. See *King v. State*, 262 Ga. 477, 478 (421 SE2d 708) (1992) (Benham, J., concurring) ("We have sought to raise the level of consciousness of all those who participate in court proceedings to encourage them to adhere to principles of honesty, truthfulness, trustworthiness, integrity, fairness and civility.").

unreasonable way considering all the circumstances and in light of prevailing professional norms." *Ward v. State*, 313 Ga. 265, 273 (4) (869 SE2d 470) (2022) (citation and punctuation omitted).

> The reasonableness of counsel's conduct is examined from counsel's perspective at the time of trial and under the particular circumstances of the case, and decisions regarding trial tactics and strategy may form the basis for an ineffectiveness claim only if they were so patently unreasonable that no competent attorney would have followed such a course.

*Taylor v. State*, 312 Ga. 1, 15-16 (6) (860 SE2d 470) (2021) (citations and punctuation omitted). See also *Robinson v. State*, 278 Ga. 31, 36 (2) (d) (597 SE2d 386) (2004) ("As a general rule, matters of reasonable trial tactics and strategy, whether wise or unwise, do not amount to ineffective assistance of counsel," and "[a] reviewing court evaluates trial counsel's performance from counsel's perspective at the time of trial."). "To satisfy the prejudice prong, a defendant must establish a reasonable probability that, in the absence of counsel's deficient performance, the result of the trial would have been different." *Moss*, 311 Ga. at 126 (2). "If an appellant fails to meet his or her burden of proving either prong of the *Strickland* test, the

reviewing court does not have to examine the other prong." Id. (citation and punctuation omitted).

On appeal, Blalock contends that the "timing of the receipt of the [State's] discovery was the central issue throughout pre-trial motions" in this case, and while he does not dispute that the State's production of discovery was timely under OCGA § 17-16-4 (a) (3) (A), he argues that his experienced trial counsel was nevertheless deficient for failing to take the "necessary step of arguing that the statute itself was unconstitutional" as applied in this case. Blalock further contends that "[t]he issue of the constitutionality of OCGA § 17-16-4 is a critical argument" that this Court needs to address—in light of the increase in the amount of discovery over the last decade which negatively impacts "criminal defendants' ability to prepare a meaningful defense"—and thus, the failure of his trial counsel to properly assert and preserve this issue prevented Blalock from seeking a ruling thereon and prejudiced him in this case.

Blalock has not cited any case addressing a constitutional challenge to OCGA § 17-16-4 (a) (3) (A), either on its face or as

27

applied, and given that we have found no authority even suggesting that the statute's constitutionality might be doubted, "trial counsel's failure to raise a novel legal argument does not constitute ineffective assistance of counsel." *Griffin v. State*, 309 Ga. 516, 520 (2) (847 SE2d 168) (2020) (quotation and punctuation omitted). See also *Esprit v. State*, 305 Ga. 429, 438 (2) (c) (826 SE2d 7) (2019) ("A criminal defense attorney does not perform deficiently when he fails to advance a legal theory that would require an extension of existing precedents and the adoption of an unproven theory of law." (Citation and punctuation omitted.)). Because Blalock has not demonstrated that his trial counsel performed deficiently by failing to raise a constitutional challenge to OCGA § 17-16-4 (a) (3) (A), his claim of ineffective assistance fails.

3. In Blalock's final contention, he asserts that the trial court erred in permitting one of the State's witnesses to comment on Blalock's post-arrest silence, which was "a violation of his constitutional rights." We conclude that, even if the trial court

28

abused its discretion in allowing this evidence to be admitted, any

such abuse of discretion was harmless error.

During defense counsel's cross-examination of Agent

Reynolds, the State's gang expert, the following exchange occurred:

> DEFENSE COUNSEL: "What chapter of Bloods or set or whatever you want to call it does Mr. Blalock belong to?"
> AGENT REYNOLDS: "I don't know. He wouldn't talk to me about it."
> DEFENSE COUNSEL: "What were his local hangouts?"
> AGENT REYNOLDS: "I don't know. He wouldn't talk to me."

At the conclusion of the prosecutor's redirect examination of this

witness, defense counsel moved for a mistrial. At that point, the

trial court inquired as to the basis for the motion, and the following

exchange occurred:

> DEFENSE COUNSEL: "The fact that this officer twice testified and violated the Defendant's right to remain silent when he said that the Defendant refused to talk to me."
> PROSECUTOR: "That was responsive to her question."
> COURT: "It was responsive to her question. So I will overrule the objection. You asked him specifically what chapter does he belong to. He said, I don't know; he wouldn't talk to me."
> DEFENSE COUNSEL: "He could have said, 'I don't know.' I didn't ask him—I said what chapter does he

belong to. He is qualified as a gang expert, your Honor. All of those questions that I asked about all of the research that he can do to determine what chapter he's a gang member of, he didn't do. That is the answer to the question, not that Defendant didn't talk to me. There are a million other ways to figure out what chapter he is a member of, other than asking the Defendant a pointed question."

COURT: "Do you have anything else?"

PROSECUTOR: "I do not."

COURT: "I will overrule the objection. I think it was responsive to the question."

Later, in denying Blalock's motion for new trial, the trial court concluded that Agent Reynolds's comments did not require a reversal. In reaching this conclusion, the trial court relied on *Whitaker v. State*, 283 Ga. 521, 524 (3) (661 SE2d 557) (2008), in which the Court explained that

> testimony about the defendant remaining silent is not deemed to be prejudicial if it is made during a narrative on the part of the authorities of a course of events and apparently was not intended to, nor did it have the effect of, being probative on the guilt or innocence of the defendant. Indeed, to warrant a reversal of a defendant's conviction, the evidence of the election to remain silent must point directly at the substance of the defendant's defense or otherwise substantially prejudice the defendant in the eyes of the jury.

30

Id. (citations and punctuation omitted). The trial court held that Agent Reynolds's comments did not directly implicate Blalock's defense and were not directed to any particular statement or defense offered by Blalock. The trial court concluded that nothing had been presented to show that Agent Reynolds's comments "were intended to, or did, have the effect of being probative on the issue of guilt or innocence."

On appeal, Blalock argues that the trial court erred in admitting Agent Reynolds's testimony commenting on Blalock's post-arrest silence.

> Because this error involves the defendant's constitutional rights, the defendant would be entitled to a new trial unless the error is harmless beyond a reasonable doubt. The determination of harmless error must be made on a case by case basis, taking into consideration the facts, the trial context of the error, and the prejudice created thereby as juxtaposed against the strength of the evidence of the defendant's guilt.

*Brewer v. Hall*, 278 Ga. 511, 513 (3) (603 SE2d 244) (2004). We conclude that, even assuming the trial court abused its discretion in

31

admitting Agent Reynolds's testimony, any such abuse of discretion was harmless error.

An examination of the context in which this error occurred shows that Agent Reynolds's testimony was very unlikely to have affected the jury's verdict in any way. Our review of the record shows that the State made no "effort to draw the jury's attention to the officer's comment," to "convince the jury to infer guilt from" Blalock's silence, or to exploit the exercise of Blalock's right to remain silent. *Brewer*, 278 Ga. at 513 (2). "Accordingly, analyzing the comment in context, it is very unlikely to have had any impact on the jury's determination of guilt." Id.

Additionally, the evidence of Blalock's guilt in this case was strong. Blalock was charged with malice murder and other crimes connected with the fatal shooting of Wright on the night of November 13, 2014. The evidence shows that, earlier that night, Blalock and Wright spoke on the telephone and arranged to meet in the Bellemeade area to conduct a drug deal. Morrow, who accompanied Wright to meet Blalock, testified that he was in the car

during the shooting, and he identified Blalock as the shooter. Dyer testified that Blalock was at his house on Bellemeade Way—adjacent to the crime scene—minutes before the shooting took place, and saliva matching Blalock's DNA was found in close proximity to the crime scene. Hill and Florence also testified that, shortly after the shooting, Blalock admitted that he shot someone on Bellemeade Way on the night of November 13. The day after the shooting, Florence took Blalock to Hill's house, and he saw Blalock retrieve a bag from an area close to the crime scene. Florence later observed Blalock remove a handgun from the bag and dispose of it. Dyer and Florence testified that Blalock was known to carry a rare 7-millimeter handgun, and 7.62-millimeter shell casings were found at the crime scene.

For these reasons, we conclude that any improper testimony from Agent Reynolds regarding Blalock's silence "was harmless beyond a reasonable doubt," and the outcome of Blalock's trial was not affected by the admission of this testimony. *Brewer*, 278 Ga. at 513 (2). Thus, this final enumeration fails.

33

*Judgment affirmed. All the Justices concur.*