**FOURTH DIVISION
DILLARD, P. J.,
BROWN and PADGETT, JJ.**

**NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
https://www.gaappeals.us/rules**

**July 23, 2024**

# In the Court of Appeals of Georgia

A24A0927. BASS v. THE STATE.

BROWN, Judge.

Following a bench trial, the trial court found Tyler Alexander Bass guilty of aggravated assault, family violence battery, possession of a firearm during the commission of a felony, possession of a firearm by a convicted felon, and two counts each of aggravated assault against a law enforcement officer when engaged in official duty, and family violence aggravated assault. Bass appeals the denial of his motion for new trial, as amended, contending that insufficient evidence supports his conviction for aggravated assault, that the State failed to disprove his justification defense, and that the trial court abused its discretion in denying his request for a continuance. For the reasons explained below, we affirm.

"Following a bench trial, we view the evidence in the light most favorable to the trial court's verdict." *Petro v. State*, 327 Ga. App. 254, 255 (758 SE2d 152) (2014). So viewed, the evidence showed that Bass and his girlfriend lived together off and on from 2016 to 2019. According to the girlfriend, the relationship could get volatile, especially when Bass was drinking. On the night of June 3, 2019, the girlfriend went to Bass' home to pick up some belongings and her dog when Bass became angry, pushed her, dragged her by her hair, and punched her in the face, busting her lip and chipping her tooth. As the girlfriend ran up the stairs, Bass grabbed her and hit her, tried to choke her with his hands, and called her a "stupid bitch." The girlfriend tried to defend herself by pulling Bass' shirt. When the shirt ripped, Bass removed it, ripped it some more, and put it around the girlfriend's neck and tried to choke her with it. The girlfriend escaped, ran to a neighbor's house, and called her "aunt,"[1] who came to get her. In addition to a busted lip and chipped tooth, the girlfriend had a black eye, swelling on her face, and marks on her shoulders and knees from falling on the concrete as Bass chased her down the driveway and street.

---

[1] The girlfriend's "aunt" was a family friend.

When the aunt and girlfriend returned to Bass' house a short time later to again attempt to get the girlfriend's belongings and her car, Bass and another man were standing in the driveway and Bass was holding a gun. As the victim started exiting the car, Bass walked up to the open driver's side window of the car and put the gun to the aunt's head. The aunt testified that she was not afraid; that she was able to talk Bass down; and that she quickly left the driveway and "fussed [at the girlfriend]" for putting her in that situation. The girlfriend testified that the aunt tried to roll up the window, "panicked, and [told the girlfriend], you better not get out [of] this car. You need to stay in the car. We're leaving your stuff here now . . . . We need to go. . . [,] I'm not doing this. Like, [the aunt is] not losing her life tonight." The girlfriend was scared for her aunt and scared Bass was going to use the gun on her "after seeing him doing that to [the] aunt." The girlfriend and the aunt left and went to a relative's house where the aunt called the police. When the police arrived, the aunt repeatedly told them that she "did not want to go back over there because of what had happened," but the police indicated that she and the girlfriend would have to lead them back to Bass' house so they could speak with Bass and get the girlfriend's belongings. The aunt complied but left as soon as the girlfriend got out of her car

because she did not want to "put [herself] back in . . . what [she] felt to be a dangerous situation." The girlfriend and one of the officers testified that the aunt "wasted no time getting away from there" because "she was scared" and "afraid of being around that house and being around [Bass]."

The first officer testified that he and his partner, both of whom were in uniform, escorted the girlfriend back to Bass' house at 3:00 a.m. so that she could get her belongings and the officers could conduct a "knock and talk" and get Bass' side of the "story." The officers approached the house in their patrol cars and left the headlights running. The girlfriend testified that it was dark out but that she could see both officers in their police uniforms and their patrols cars on the road; the second officer explained that the patrol cars were "illuminat[ed]" by the headlights. The first officer approached the front door of Bass' home while the second officer stood to the side of the house in the driveway so that she could see the back of the house. Both officers and the girlfriend could hear "excessively" loud music coming from inside the home. After the first officer knocked on the front door four times, Bass turned off the music.

Several minutes later, Bass came around the back of the house carrying a beer can in one hand and a gun in the other. As the second officer yelled at Bass to "put

[the] gun down" and attempted to unholster her gun, Bass raised his arm and fired at her. The second officer fell down and shot back at Bass, while the first officer ran to assist his partner. Bass continued to shoot at the officers, who returned fire, and the first officer testified that he was "ambushed" and felt "a bullet [fly] past [his] head." When the gunshots subsided, the first officer called for backup and both officers ran to a wooded area adjacent to the home. At the time of the incident, both officers observed that the person who fired at them was "in his 20s," "light skinned," and wearing red shorts and a white shirt. The incident ended approximately five hours later when Bass surrendered to a SWAT team. At the time he surrendered, Bass was wearing red shorts.

Bass testified at trial that his girlfriend attacked him and that he pushed her away. He denied holding a gun in his driveway and pointing it at the aunt, and explained that after the girlfriend and aunt left, he went back in his house to "prepar[e] vocals and stuff" when he heard a knock at his back door. Thinking that his brother was at the door, Bass grabbed a gun to check on the sound and went out the back door. He could not see anything but heard giggling and a gunshot, and then felt a gunshot by his left shoulder, so he shot back. As he tried to go back in the house,

Bass felt another bullet. He then went back in the house, passed out because he was drunk, and came out of the house after the sun came up.

1. Bass contends that there was insufficient evidence to support his conviction of aggravated assault of the aunt because she testified that she was not afraid when Bass pointed his gun at her and therefore did not have a reasonable apprehension of harm. We find no merit in this contention.

Count 4 charged Bass with "the offense of AGGRAVATED ASSAULT in violation of OCGA § 16-5-21, for the said accused . . . did make an assault upon the person of [the aunt], with a deadly weapon, to wit: handgun by pointing said gun at said person[.]" The definition of simple assault includes "an act which places another in reasonable apprehension of immediately receiving a violent injury." OCGA § 16–5–20 (a) (2). An assault becomes aggravated in certain ways, including when it is perpetrated by use of a deadly weapon. OCGA § 16–5–21 (a) (2). "So, if the victim is in reasonable apprehension of an immediate violent injury from a weapon, an aggravated assault has occurred." *Carter v. State*, 248 Ga. App. 139, 139 (1) (546 SE2d 5) (2001). "Because reasonable apprehension of injury is not the same as simple fear, the testimony that the victim was not afraid of the defendant does not preclude

conviction." (Citations and punctuation omitted.) *Lunsford v. State*, 260 Ga. App. 818, 821 (2) (581 SE2d 638) (2003), disapproved on other grounds, *Scott v. State*, 306 Ga. 507, 510 (2) (832 SE2d 426) (2019). As our appellate courts have explained, "[p]roof that the victim has been placed in apprehension of immediately receiving a violent injury need not necessarily be solely by reason of the victim's testimony of [her] mental state but may be inferred from the conduct of the victim such as when [she] retreats to secure [her] safety." (Punctuation omitted.) *Howard v. State*, 288 Ga. 741, 742 (1) (707 SE2d 80) (2011), citing *Heard v. State*, 204 Ga. App. 757, 759 (2) (420 SE2d 639) (1992). See also *Williams v. State*, 208 Ga. App. 12, 13 (430 SE2d 157) (1993) ("[t]he state of mind of either a perpetrator or a victim, including whether a victim has been placed under reasonable apprehension of injury or fear from an event, when in issue may be proved by indirect or circumstantial evidence") (emphasis omitted).

Even though the aunt testified that she was not afraid, the girlfriend testified that the aunt was afraid. Additionally, the evidence showed that the aunt quickly left Bass' driveway after the incident; "fussed [at the girlfriend]" for putting her in that situation; drove to a friend's house and called police; repeatedly told the police that

she did not want to return to Bass' house because of what happened; and then left Bass' house as soon as the girlfriend got out of her car because she did not want to put herself back in what she felt was a dangerous situation. Viewing this evidence in the light most favorable to the trial court's verdict, we conclude that it was sufficient to find that Bass placed the aunt in reasonable apprehension of immediately receiving a violent injury. See *Howard*, 288 Ga. at 742 (1) (evidence that victims ran from gunfire was sufficient to find that defendant placed them in reasonable apprehension of immediately receiving a violent injury); *Lunsford*, 260 Ga. App. at 821–822 (2) (even though victim testified that she was not afraid when defendant shot at her and hit the telephone on which she was speaking, evidence that victim ran out of the house after the shot was fired was sufficient to find defendant guilty of aggravated assault). See also *In the Interest of J. H.*, 354 Ga. App. 253, 256 (3) (840 SE2d 633) (2020) (despite victim's testimony that he was not nervous and did not think defendant would hurt him with a butcher knife, fact that victim jumped in his vehicle and "swerved off just to get away" supported the juvenile court's finding that victim was placed in reasonable apprehension of immediately receiving a violent injury) (punctuation omitted).

8

2. Bass contends that the evidence was insufficient to support his convictions of aggravated assault against law enforcement officers engaged in official duty, OCGA § 16-5-21 (c), because the State did not disprove that he was justified when he shot at the two officers. We disagree.

"When a defendant effectively raises an affirmative defense such as self-defense the State bears the burden of disproving the asserted defense beyond a reasonable doubt." *Mosby v. State*, 300 Ga. 450, 451 (1) (796 SE2d 277) (2017). It is a question for the trier of fact whether the circumstances justified the defendant's use of a deadly weapon against the victim. See *Blair v. State*, 273 Ga. 668, 668 (1) (543 SE2d 685) (2001); *Hoffler v. State*, 292 Ga. 537, 539 (1) (739 SE2d 362) (2013) ("[i]ssues of witness credibility and the existence of justification are for the [fact finder, who] is free to reject a defendant's claim that he acted in self-defense"); *Howe v. State*, 322 Ga. App. 294, 297-298 (744 SE2d 818) (2013) (trial court, as trier of fact, is arbiter of justification defense).

> A person is justified in threatening or using force against another when and to the extent that he or she reasonably believes that such threat or force is necessary to defend himself or herself or a third person against such other's imminent use of unlawful force; however, except as

9

provided in Code Section 16-3-23,[2] a person is justified in using force which is intended or likely to cause death or great bodily harm only if he

[2] OCGA § 16-3-23 provides:

A person is justified in threatening or using force against another when and to the extent that he or she reasonably believes that such threat or force is necessary to prevent or terminate such other's unlawful entry into or attack upon a habitation; however, such person is justified in the use of force which is intended or likely to cause death or great bodily harm only if:

(1) The entry is made or attempted in a violent and tumultuous manner and he or she reasonably believes that the entry is attempted or made for the purpose of assaulting or offering personal violence to any person dwelling or being therein and that such force is necessary to prevent the assault or offer of personal violence;

(2) That force is used against another person who is not a member of the family or household and who unlawfully and forcibly enters or has unlawfully and forcibly entered the residence and the person using such force knew or had reason to believe that an unlawful and forcible entry occurred; or

(3) The person using such force reasonably believes that the entry is made or attempted for the purpose of committing a felony therein and that such force is necessary to prevent the commission of the felony.

or she reasonably believes that such force is necessary to prevent death or great bodily injury to himself or herself or a third person or to prevent the commission of a forcible felony.

OCGA § 16-3-21 (a). See also *Craw v. State*, 369 Ga. App. 231, 237-238 (1) (893 SE2d 134) (2023).

Bass contends that the State failed to disprove his justification defense for several reasons, including that (1) the officers were trespassing on his property as evidenced by the fact that they came on the property simply to perform a knock and talk; (2) the second officer was preparing to commit a forcible felony (aggravated assault) on Bass' property because she was drawing her weapon when she encountered Bass; (3) it was 3:00 in the morning and the area around Bass' home was dark and the officers used the front door, which the girlfriend advised nobody uses; and (4) the officers intentionally concealed their identity by failing to identify themselves as law enforcement or to activate the emergency lights on their vehicles. We find no merit in any of these claims.

The evidence showed that Bass was inside his home when the officers accompanied the girlfriend onto the property and knocked on the front door; Bass was not in any danger or any threat or imminent harm at the time he chose to exit from the

11

rear of his home. See *Adcock v. State*, 317 Ga. App. 468, 469 (1) (731 SE2d 365) (2012) (trial court did not err in failing to instruct the jury on justification defenses of self-defense, defense of habitation, and defense of property where there was "no evidence of any imminent threat of harm that would justify [the defendant's] use of force under OCGA § 16-3-21 (a); no evidence of an unlawful entry into [the defendant's] habitation that would justify his use of force under OCGA § 16-3-23; and no evidence of tortious or criminal interference with [the defendant's] real or personal property that would justify his use of force under OCGA § 16-3-24"). Cf. *Powell v. State*, 154 Ga. App. 568, 570 (2) (269 SE2d 70) (1980) (rejecting defendant's claim that trial court erred in sufficiently charging jury on his defenses such as justification; although trial court did charge on justification, evidence did not show that defendant reasonably believed force was necessary to prevent death or great bodily injury to himself). Moreover, the State presented evidence that both officers were dressed in uniform and visible even though it was dark, and that the second officer instructed Bass to drop his gun before Bass shot at the officers; notwithstanding Bass' claim to the contrary, the trial court was authorized to conclude that Bass shot at the second officer first, and that she fell backward into the bushes and then attempted to

unholster her weapon. See *Bennett v. State*, 265 Ga. 38, 39 (1) (453 SE2d 458) (1995) (concluding that evidence was sufficient to disprove justification defense; it is for the fact finder to decide issues of credibility, and here, "[t]he jury's verdict indicates that it believed the evidence contrary to appellant's justification defense"). In this case, the evidence was sufficient to disprove Bass' justification defense beyond a reasonable doubt. See, e.g., *Hepburn v. State*, 269 Ga. App. 817, 819-820 (1) (605 SE2d 624) (2004).

3. Bass contends that the trial court violated his constitutional right to retained counsel when it denied his request for a continuance. We disagree.

"The grant or denial of a continuance . . . is within the discretion of the trial court and will not be disturbed unless it clearly appears the trial court abused that discretion." (Citation and punctuation omitted.) *Collins v. State*, 269 Ga. App. 164, 165 (603 SE2d 523) (2004). "The Constitution of Georgia, Art. I, Sec. I, Par. XIV has been interpreted to confer upon every criminal defendant the right to be represented by counsel of his own selection whenever he is able and willing to employ an attorney, and uses reasonable diligence to obtain his services." (Citation and punctuation omitted.) *Alwi v. State*, 331 Ga. App. 903, 904 (773 SE2d 387) (2015). But, "this does

not mean that a defendant may retain any counsel at any time he wishes; there are limits to a defendant's right to counsel of choice." (Citation and punctuation omitted.) Id. For example,

> a defendant's right to counsel may not be insisted upon in a manner that will obstruct an orderly procedure in courts of justice, and deprive such courts of the exercise of their inherent powers to control the same. Indeed, when a defendant attempts to hire new counsel for purposes of delay, a trial court does not abuse its discretion by prohibiting such conduct.

(Citations and punctuation omitted.) Id. at 904-905. "[T]he essential aim of the [Sixth] Amendment is to guarantee an effective advocate for each criminal defendant rather than to ensure that a defendant will inexorably be represented by the lawyer whom he prefers." *Lynd v. State*, 262 Ga. 58, 62 (9) (a) (414 SE2d 5) (1992), citing *Wheat v. United States*, 486 U. S. 153, 159 (II) (108 SCt 1692, 100 LE2d 140) (1988).

The record reflects that Bass' retained counsel filed an entry of appearance on October 17, 2019. Subsequently, the trial court specially set the case for trial on May 9, 2022, June 6, 2022, and September 6, 2022. When the case was called for trial on September 6, 2022, Bass advised the trial court that he was having concerns with retained counsel's continued representation, and retained counsel made an oral

motion to withdraw from the case. The trial court advised Bass of his rights and obligations upon counsel's withdrawal and Bass stated his intent to retain new counsel. On September 16, 2022, the trial court granted retained counsel's motion to withdraw from the case and noted that appointed counsel had filed an entry of appearance in the case. On December 9, 2022, the trial court issued an order, advising both the State and Bass that the case had been on numerous trial calendars; was currently scheduled to be tried on December 12, 2022; and that "[s]hort of an unforeseen and unavoidable exigency, the trial shall proceed as scheduled without further delay or continuance."

On December 12, 2022, when the case was called for trial, appointed counsel announced that she was "ready" for trial, but explained that an attorney retained by Bass' family attempted to file an entry of appearance in the case and asked for a continuance, but then left before the trial began. The trial court announced on the record that it had denied the continuance, finding that appointed counsel had been advocating and zealously representing Bass and that the motion for continuance was made for "the purpose of delay." The trial court also noted that Bass had already delayed the start of trial by refusing to "get dressed" and that it was not going to delay

the trial again because Bass had "been in custody for over 1200 days . . . and [it would be] a gross manifest injustice to reset this case again after it has been specially set," but that counsel could come back and "tag team" with appointed counsel. When allowed to address the trial court about any concerns, Bass explained that he was not given access to "things at the [prison] law library" and that it was "holding [him up from] being exonerated from guilt." When the trial court explained that Bass was presumed innocent and that if the State could not meet its burden of proof that would inure to Bass' benefit, Bass then waived his right to a jury trial and proceeded with a bench trial, without further mention of counsel's representation.

Here, Bass' case was scheduled for trial and the trial court expressly advised the parties before the scheduled date that the trial would proceed as scheduled without further continuance. Nonetheless, Bass waited until the day of trial to advise the trial court that he wished to hire new counsel after appointed counsel had engaged in discovery and trial preparation for three months and announced that she was ready to try the case. Moreover, when given the opportunity to voice any concerns, Bass did not mention any issues with appointed counsel or her representation. And, even though the attorney Bass sought to hire departed after the trial court denied the

continuance, the trial court offered to allow retained counsel and appointed counsel to represent Bass as a "tag team," but Bass seemingly rejected this offer. Under the circumstances, the trial court here did not abuse its discretion in prohibiting Bass from delaying the trial any further and in allowing the trial to proceed with appointed counsel. See *Lane v. State*, 299 Ga. 791, 793-794 (2) (792 SE2d 378) (2016) (no abuse of discretion in denying a continuance where trial court warned defendant that specially scheduled trial would not be changed); *Hampton v. State*, 272 Ga. App. 565, 566-567 (2) (612 SE2d 854) (2005) (affirming denial of continuance where record showed, inter alia, that appointed counsel had announced ready for trial and engaged in discovery and trial preparation for several months before defendant sought to proceed with different counsel). See also *Blalock v. State*, 316 Ga. 330, 338 (1) (888 SE2d 98) (2023) (affirming denial of continuance where trial court considered several factors including that it had specially set appellant's trial date).

*Judgment affirmed. Dillard, P. J., and Padgett, J., concur.*